IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SEAN KENDALL,<br><br>    Plaintiff,<br><br>v.<br><br>BRETT OLSEN, LT. BRIAN PURVIS, JOSEPH ALLEN EVERETT, TOM EDMUNDSON, GEORGE S. PREGMAN, and SALT LAKE CITY CORPORATION,<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Civil No. 2:15-cv-00862<br><br>Judge Robert J. Shelby |

This case arises from the 2014 shooting of Sean Kendall's dog by a Salt Lake City Police Officer. The parties initially engaged in settlement negotiations, after which Kendall filed a Complaint with various state and federal claims, and Defendants filed a counterclaim to enforce a settlement agreement and dismiss the Complaint. Both sides now move for summary judgment on Defendants' counterclaim. For the reasons below, the court grants Kendall's motion, denies Defendants' motion, and dismisses the counterclaim with prejudice.

**BACKGROUND**

In June 2014, Salt Lake Police Officer Brett Olsen shot and killed Sean Kendall's dog after entering Kendall's backyard to look for a missing child. Over the ensuing month, Kendall engaged in settlement negotiations with the City and the other Defendants in this case. On July 15, 2014, Kendall offered to resolve the dispute for $10,000. Six days later, the City orally accepted the offer and told Kendall it would draft a written agreement. The City sent the agreement a few days later, and then sent an amended agreement the next day with only minor

changes. The agreement made clear that "there [was] no effective agreement" until each party had signed it.[1]

Ultimately, the agreement was never signed. After some back and forth between the parties—the details of which are discussed below—Kendall stated publicly that he would not be settling the case, and the City told Kendall that it "consider[ed] settlement negotiations terminated."[2] According to a public statement by the Salt Lake City Police Chief, the City at that point "ended [its] attempts to meet [Kendall's] financial demands."[3]

Over a year later, Kendall filed this lawsuit. The City then filed a counterclaim asking the court to enforce an oral settlement agreement and dismiss Kendall's Complaint. Both parties filed motions for summary judgment on the counterclaim.

## ANALYSIS

The court evaluates a settlement agreement just like any other contract.[4] The fundamental question is whether there was "a meeting of the minds" on the settlement terms.[5] In resolving this question the court looks to whether the parties expressed a mutual intent to be bound by the essential terms of the agreement, and whether those terms were expressed clearly enough to be enforced.[6] The City, as the proponent of the agreement, carries the burden of

---

[1] Dkt. 56-6.
[2] Dkt. 56-10.
[3] Dkt. 65-14.
[4] *Mascaro v. Davis*, 741 P.2d 938, 942 (Utah 1987) ("[B]asic contract principles affect the determination of when a settlement agreement should be so enforced.").
[5] *Sackler v. Savin*, 897 P.2d 1217, 1220 (Utah 1995).
[6] *Id.* at 1221; *Richard Barton Enters., Inc. v. Tsern,* 928 P.2d 368, 373 (Utah 1996).

demonstrating that it is "more probable than not" that the parties reached an agreement.[7] When material facts are not in dispute, this is a legal question for the court.[8]

The City argues there was a meeting of the minds on all material terms after Kendall offered to settle the dispute for $10,000 and the City accepted. It contends the parties mutually intended to be bound by that oral agreement, and any subsequent writing would merely codify the agreement. Kendall, on the other hand, argues that the City's oral assent to the $10,000 term was merely a part of the parties' negotiations, that the parties intended to ultimately be bound by a written agreement, and that the written agreement never came to fruition.

Utah law recognizes both theories. That is, it acknowledges that an oral discussion preceding a written agreement can itself form a binding contract, with the subsequent written agreement merely memorializing the oral contract. Alternatively, it recognizes that an oral discussion, even when material terms are agreed to, might constitute nonbinding negotiations leading up to a binding written agreement.[9] In distinguishing between the two, the parties' intent is dispositive; the question is whether the parties intended to be bound by the oral agreement, or, alternatively, whether "an intention is manifested in any way that legal obligations between the parties shall be deferred until the writing is made."[10] To ascertain the parties' intent, the court looks to the agreement itself, to the parties' communications, and to their conduct.[11]

---

[7] *Sackler*, 897 P.2d at 1222.
[8] *United States v. Hardage*, 982 F.2d 1491, 1496 (10th Cir. 1993) ("A trial court has the power to summarily enforce a settlement agreement" when no material facts are in dispute.).
[9] *Compare McKelvey v. Hamilton*, 211 P.3d 390, 398 (Utah Ct. App. 2009) (Written agreement was merely a formalization of previous oral agreement.)*, with 1-800 Contacts, Inc. v. Weigner*, 127 P.3d 1241, 1243 (Utah Ct. App. 2005) (Oral agreement on certain material terms was not binding because parties clearly intended to be bound by a written agreement.).
[10] *Lebrecht v. Deep Blue Pools & Spas Inc.*, 374 P.3d 1064, 1072 (Utah Ct. App. 2016).
[11] *McKelvey*, 211 P.3d at 397.

In this case, the written agreement, the parties' communications, and their conduct all suggest that the parties intended to be bound, if at all, by a signed written agreement, not by the parties' oral negotiations. As to the written agreement prepared by the City, the agreement contains two clauses—an integration clause and an execution clause—that suggest the signed written agreement, not any preceding oral agreement, would bind the parties. The integration clause states that the agreement "reflect[s] the entire understanding of the parties and there are no representations, warranties or undertakings other than those expressed and set forth in this agreement."[12] This suggests the City believed and intended that any representations, warranties, or undertakings resulting from the previous oral agreement had no legal effect. Similarly, the execution clause states "there is no effective agreement until each of the parties hereto has executed at least one counterpart" of the agreement.[13] This suggests the City did not intend or believe the oral negotiations concluded with an "effective agreement," but instead understood that there wouldn't be one until the written agreement was signed. Not only do these terms compel that conclusion, the terms the City removed from the agreement do as well: when it amended the agreement, the City "removed language regarding the date that [the parties] enter into the settlement agreement because it w[ould] be apparent from the signature lines."[14] A plain reading of this representation is that there would be an agreement when the written document was signed and dated, not before.

Also relevant in determining the parties' intent is the initial oral agreement. It's true, as the City points out, that in their oral communications the parties came to agreement on the

---

[12] Dkt. 33-7.
[13] *Id.*
[14] *Id.*

essential term of the settlement: the $10,000 payment. But that's not dispositive. Indeed, "parties may have agreed on some of the essential terms of their settlement," but "these agreements are not dispositive . . . if an intention is manifested in any way that legal obligations between the parties shall be deferred until the writing is made."[15] Here, the representations in the written agreement make clear that notwithstanding the oral agreement to the $10,000 term, the parties intended to defer legal obligations until the written agreement was signed.

The communications between the parties bear out this interpretation as well. On July 29, after Kendall posted on Facebook that he would not be settling, the City sent an email to Kendall's attorney in which it referred to "the *potential* settlement," it noted that "it seem[ed] clear to [the City] that [Kendall was] withdrawing his offer to settle this matter," and it gave Kendall an ultimatum: if the City "[did] not receive the signed settlement agreement by 5 p.m.," the City would "consider [Kendall] to have rescinded his offer, and accordingly, [the City] w[ould] terminate settlement negotiations."[16] That afternoon, Kendall posted to Facebook that he *would* be settling, and then an hour later reaffirmed that he would *not* be settling.[17] Ten minutes before the 5 p.m. deadline, Kendall's attorney asked for a two-day extension on the ultimatum to "get this worked out."[18] The 5 p.m. deadline came and went without Kendall returning a signed copy of the written agreement. The City then became aware that Kendall had told the Salt Lake Tribune that he would not be settling, and in a 5:08 p.m. email to Kendall, the City represented that it now believed, based on Kendall's public statements, that Kendall "ha[d]

---

[15] *Lebrecht*, 374 P.3d at 1072.
[16] Dkt. 33-10 (emphasis added).
[17] Dkts. 33-9, 44.
[18] Dkt. 33-13.

rescinded his offer," and that because Kendall hadn't returned a signed copy of the written agreement by 5 p.m., Kendall "should consider settlement negotiations terminated."[19] Later that night the Police Chief publicly stated that the City had "ended [its] attempts to meet [Kendall's] financial demands."[20]

These are not the statements of parties that believe themselves bound by a settlement agreement. The internal debate playing out in Kendall's Facebook posts about whether or not he would settle indicates that he did not believe himself already bound by an oral agreement, as confirmed by his final Facebook post in which he states that he "did not accept the settlement."[21] And it's difficult to square the City's statements that it "consider[ed] settlement negotiations terminated" and that it had "ended [its] attempts to meet [Kendall's] financial demands" with its present contention that it believed the parties had agreed to be bound by the $10,000 oral agreement.

Nor does the conduct of the parties indicate they believed themselves bound by an oral agreement. After the parties agreed on the $10,000 term, the City did not send Kendall a check and a release of claims, it sent him a written agreement to sign.[22] When Kendall requested an extension of the deadline to return that agreement, the City's attorney did not capitulate—as might be expected if the City thought it were merely memorializing an already-effective oral agreement—but instead told Kendall that he didn't think the City would agree to an extension.[23]

---

[19] Dkt. 42-10.
[20] Dkt. 65-14.
[21] Dkt. 44.
[22] *See, e.g.*, *Hunt v. Schauerhamer*, No. 2:15-cv-1-TC-PMW, 2016 WL 715797, at *3 (D. Utah. Feb. 22, 2016) (City sent a claim release and ordered a settlement check within an hour of parties entering into oral agreement.).
[23] Dkt. 42-9.

Kendall then declined to return the agreement by the City's 5 p.m. deadline, indicating his acquiescence to the City's "terminat[ing] settlement negotiations." And when the City learned that Kendall did not intend to sign the agreement—both through his failure to return the agreement by 5 p.m. and through his statement to the Tribune—it did not file a motion to enforce the settlement agreement.[24] Indeed, it filed nothing until over a year later, when, motivated apparently by Kendall's filing of suit, it asserted a counterclaim to enforce the oral settlement.

In short, nothing about the agreement, the parties' correspondence, or their actions demonstrates an intent to be bound by an oral agreement. The evidence does not indicate there was a meeting of the minds, and in fact indicates the opposite: it suggests that neither party believed itself bound by the $10,000 oral agreement nor wished to be bound by the agreement. As such, the court concludes that the City has not demonstrated it is more probable than not that the parties had a binding oral agreement.[25] Kendall's motion for summary judgment on the City's counterclaim[26] is granted. The City's motion[27] is denied. The City's counterclaim is dismissed with prejudice.

DATED this 31st day of January, 2017.

BY THE COURT

_____
Honorable Robert J. Shelby

---

[24] *See Hunt*, 2016 WL 715797, at *4 (City filed a motion to enforce the settlement agreement when it learned that the plaintiff did not intend to honor it.).
[25] *Sackler*, 897 P.2d at 1222.
[26] Dkt. 56.
[27] Dkt. 32.