IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SEAN KENDALL,<br><br>                Plaintiff,<br><br>v.<br><br>BRETT OLSEN, LT. BRIAN PURVIS,<br>JOSEPH ALLEN EVERETT, TOM<br>EDMUNDSON, GEORGE S. PREGMAN,<br>and SALT LAKE CITY CORPORATION,<br><br>                Defendants. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>Civil No. 2:15-cv-00862-RJS-DBP<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Dustin B. Pead |

        This case arises from the 2014 shooting of Sean Kendall's dog by Salt Lake City Police

Officer Brett Olsen during a search for a missing toddler.  After the shooting, Kendall brought

various state and federal claims against Olsen, the City, and several other officers.  Both sides

now move for summary judgment.  For the reasons below, the court grants Defendants' Motion

for Summary Judgment on Kendall's federal constitutional claims and remands the case back to

state court for further proceedings on Kendall's state claims.

## BACKGROUND

        On June 18, 2014, Officer Brett Olsen was patrolling the Sugar House neighborhood of

Salt Lake City by motorcycle when he received word that a mother had reported her toddler

missing from their home.  Olsen quickly drove to the home, where several officers were already

on the scene setting up a mobile command station.  A supervisor, Lieutenant Purvis, instructed

Olsen to begin canvassing the neighborhood in search of the missing boy.  He alerted Olsen that

the boy could not communicate verbally, and instructed that Olsen should therefore search

everywhere visually.  By the time Olsen began searching, it was believed the child had been

missing for about an hour.  This was significant, as time is generally thought to be crucial when

searching for missing children, with the likelihood of positive outcomes decreasing significantly

after about the first hour.

Olsen teamed up with another officer and began traveling north from the missing boy's

home, as depicted in the map below.  The officers went house to house knocking on doors.

Some homeowners invited the officers into their homes and yards to look around.  If nobody was

home, the officers would briefly check the backyard if it was unfenced or if a fence gate was

unlocked.  The officers searched several homes in this manner.



Eventually, the officers arrived at Kendall's house, about ten homes away from the missing toddler's home. Olsen's partner went to the front door while Olsen walked to the side gate leading to Kendall's backyard, as depicted in the map above, and in greater detail in the overhead image of the home below. While his partner waited for a response, Olsen looked over the fence into the backyard at the location marked "Gate B" below.



From his vantage point at Gate B, Olsen could not see the entire backyard. He testified that after hearing no response from his partner's knocking at the front door, he tried the gate, which was unlocked, and entered the backyard. Olsen walked through the backyard to a shed in the corner of the property (top right corner in the image above), checked the shed, and found nothing. According to Olsen, as he turned and began to leave, he heard a dog begin barking

behind him.  He turned back toward the shed and saw a 90-pound dog about 20–25 feet away "running toward [him] and barking loudly."  Presumably, the dog had emerged from a dog house wedged between the north side of the shed and the fence.  Olsen began retreating quickly toward the gate, but the dog rapidly closed on him.  Realizing he would not make it to the gate before the dog reached him, Olsen stopped, turned toward the dog, took "an aggressive stance," and stomped his foot, hoping the dog would back down.  He did not, and, according to Olsen, instead continued to charge, barking with teeth bared.  As the dog closed in to the point where Olsen felt it was "about to attack and to latch onto [him]," Olsen withdrew his service firearm and fired twice, killing the dog a few feet from where Olsen stood.  Olsen secured the area and notified his supervisor of the incident by radio.

Ultimately, the missing boy was found unharmed sleeping in his family's basement underneath a box.  Just over a year later, Kendall filed a Complaint in state court alleging federal and state constitutional violations as well as various other violations of state law.  Defendants removed the case to federal court.  Both parties now move for summary judgment on Kendall's federal constitutional claims.[1]

## ANALYSIS

Both sides contend the undisputed facts entitle them to summary judgment.  Kendall argues Olsen's entrance into his backyard was an unconstitutional search and the shooting of his dog was an unconstitutional seizure under the Fourth Amendment.[2]  Defendants contend Olsen's

---

[1] Defendants also moved for summary judgment on Kendall's state constitutional claims, but as discussed below, the court declines to rule on those claims.
[2] In addition to his Fourth Amendment claim, Kendall initially brought a Fifth Amendment claim against Defendants, but he later withdrew this claim.  Dkt. 45 at 1.

entrance into Kendall's backyard was not a search, and even if it was, it was justified by exigent circumstances—namely, the urgent need to find the missing toddler.  As to the seizure, Defendants argue that the shooting of Kendall's dog was reasonable because the dog acted aggressively toward Olsen.  Alternatively, Defendants argue that even if the search or seizure violated the Fourth Amendment, Olsen is not liable because he is protected by qualified immunity.

## I.      The Qualified Immunity Doctrine

Olsen's invocation of qualified immunity changes the constitutional analysis slightly, so before delving into the constitutional claims, the court first provides a brief discussion of qualified immunity.  Kendall sued the City and the officers under 42 U.S.C. § 1983, which, in essence, allows a citizen to sue a government official, like a police officer, for any constitutional violations that official commits on the job.  Allowing citizens to sue police officers, however, potentially leads to the unintended consequence of deterring officers from taking action in difficult situations for fear they may ultimately be sued.  Indeed, "police officers are often forced to make split-second judgments . . . in circumstances that are tense, uncertain, and rapidly evolving."[3]  We rely on officers to make these difficult decisions quickly, even if it is not entirely clear exactly what the law requires in every circumstance, because "[p]eople could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process."[4]

---

[3] *Graham v. Connor*, 490 U.S. 386, 397 (1989).
[4] *United States v. Najar*, 451 F.3d 710, 714 (10th Cir. 2006) (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963)).

Courts have developed the doctrine of qualified immunity to balance the competing interests of vindicating citizens' important constitutional rights with affording police officers some necessary leeway to make difficult decisions. Under this doctrine, an officer is liable for violating a constitutional right only if his mistake about what the law requires is unreasonable.[5] The court determines whether an officer's mistake was reasonable based on whether it resulted in him violating a constitutional right that has been clearly established by the courts.[6] Where a constitutional right has been clearly established, an officer is expected to be aware of it and to act accordingly. But where reasonable officers could disagree about whether an action is lawful— that is, where the right has not yet been clearly established—the officer will not be liable for his mistake.

What this means for Kendall is that the law requires not only that he establish that Olsen violated the Fourth Amendment by searching his yard or seizing his dog, but also that any reasonable officer would know that the search or seizure was in violation of the Fourth Amendment in view of the specific circumstances presented. With these principles in mind, the court turns to the constitutional questions.

## II. The Search

Kendall first claims that Olsen violated the Fourth Amendment by entering his backyard without a warrant. He contends that the search of a home and the surrounding area requires either a warrant or an exception to the warrant requirement, and that in this case Olsen had neither. In response, Defendants argue Olsen's limited sweep of Kendall's backyard was not a

---

[5] *Saucier v. Katz*, 533 U.S. 194, 205 (2001).
[6] *Id.* at 202.

"search" within the meaning of the Fourth Amendment, and even it was, the warrant requirement was excused by the exception for exigent circumstances.

The Fourth Amendment generally prohibits searching a home without a warrant.[7]  And in certain circumstances, this prohibition extends to the area immediately surrounding the home, what is known as the "curtilage."[8]  Here, Olsen did not enter Kendall's home, but instead entered his backyard, which, according to Kendall, is protected Fourth Amendment curtilage. Defendants disagree.  They contend Kendall's backyard was not sufficiently private to constitute protected curtilage, so Olsen's entrance into the backyard was not a "search" of any Fourth Amendment-protected area.

The question of whether any particular backyard is or is not protected curtilage is not so clear cut.  Indeed, it "depends upon a number of facts and factors," including how close the area is to the home, how the area is used, and what steps the homeowner has taken to ensure its privacy.[9]  But the court need not answer that question today, for even assuming Kendall's backyard was protected Fourth Amendment curtilage—meaning Olsen's entrance into the backyard was a "search" for Fourth Amendment purposes—it was justified by the exigent circumstances of locating a missing child.

As discussed, the Fourth Amendment typically requires a warrant to conduct a search, especially of the home, but that requirement is excused when an officer faces exigent circumstances, such as "assist[ing] persons who are seriously injured or threatened with such

---

[7] *United States v. Porter*, 594 F.3d 1251, 1255 (10th Cir. 2010).
[8] *United States v. Cavely*, 318 F.3d 987, 993 (10th Cir. 2003).
[9] *Id.* at 993–94.

injury."[10]   A warrant, for example, "is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting, or to bring emergency aid to an injured person."[11]   Warrants take time, and in certain limited circumstances where time is of the essence, courts will not require one.  To demonstrate the existence of one of these circumstances and invoke the exigency exception to the warrant requirement, an officer must demonstrate: (1) he had an objectively reasonable basis to believe there was an immediate need to protect the lives or safety of himself or others; and (2) the manner and scope of the resulting search was reasonable.[12]

As to the first prong of the test, there can be no doubt that when a toddler goes missing there is an immediate need to protect life or safety.  Courts have noted that "the problem of missing children is a profoundly serious one,"[13] and Congress has recognized that "missing children are at a great risk."[14]   Kendall himself "concedes that . . . there were reasonable grounds for . . . Olsen to believe there was an urgent situation" because "to [his] knowledge, a two- or three-year-old boy was missing from his home."[15]   That there was an exigency does not appear to be in dispute.

---

[10] *Porter*, 594 F.3d at 1256–57 (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)).

[11] *Najar*, 451 F.3d at 714 (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963)).

[12] *Id.* at 718.

[13] *United States v. Wei Seng Phua*, No. 2:14-CR-00249-APG, 2015 WL 427862, at *17 (D. Nev. Feb. 2, 2015).

[14] *Cuevas v. City of Philadelphia*, No. CIV. A. 05-3749, 2006 WL 2345928, at *6 (E.D. Pa. Aug. 11, 2006) (citing congressional findings related to the Juvenile Justice and Delinquency Prevention Act, 42 U.S.C. § 5601).

[15] Dkt. 45 at 78.

What is in dispute is the second prong of the test—the reasonableness of the scope and manner of the search for the child.[16]  On this point, Defendants argue the scope of the search was reasonable because officers confined the search to places a toddler could have accessed in a radius surrounding his home within which he could have wandered in the time that had passed. And as to manner, Defendants argue the officers reasonably knocked first to ask homeowners for permission to look around, and absent homeowner permission they conducted only a quick sweep of open backyards, not the inside of homes or other locked areas.  Kendall disagrees, arguing it was unreasonable for officers to conduct a blanket search of any area within a certain radius of the missing child's home.

The scope of a search is reasonable when the search is limited to "the locations where a victim might likely be found," and the manner of searching is reasonable when the intrusion is no greater than necessary given the exigency.[17]  Here, the toddler had been missing for an hour by the time Olsen began canvassing the neighborhood, and the child's mother gave officers no indication of what direction he may have wandered.  Given these facts, the court finds it was reasonable for officers to confine the scope of the search to places to which a toddler could have walked in the hour or so that had passed, and within that radius to further confine the search to areas a toddler could have actually have accessed, like open and unlocked backyards. Considering the limited information officers were given, these were the locations where the toddler might likely be found.  As to the manner, the court concludes that the intrusion— knocking on doors and quickly sweeping unlocked backyards—was no greater than necessary,

---

[16] The reasonableness of the search is a question of law for the court to resolve.  *McInerney v. King*, 791 F.3d 1224, 1232 (10th Cir. 2015).
[17] *Najar*, 451 F.3d at 720.

especially considering the nature of the exigency, and, in particular, the fact that the missing boy was noncommunicative and had to be located visually.

Kendall's main area of disagreement is with the reasonableness of the scope of the search.  According to Kendall, accessibility and proximity to a missing child are not enough to justify searches of neighboring yards.  He contends the mere fact that a yard is accessible to a toddler and is within walking distance of the toddler's home, on its own, is insufficient to tie a search of the yard to the exigency of the missing toddler.  Instead, Kendall proposes a different rule: that an exigency-based search of a yard for a missing toddler is constitutional only if there is a reasonable basis, aside from access and proximity, to believe the toddler is in that particular yard, as opposed to any other accessible yard within walking distance.

Kendall's interpretation is not borne out by the case law, nor does it comport with the realities of on-the-ground police work.  In support of his proposed rule, Kendall cites a line from *United States v. Gambino-Zavala*, where the Tenth Circuit framed the exigency exception as requiring that "the government must show the officers reasonably believed a person *inside the home* was in immediate need of aid or protection."[18]  Kendall seizes on this reference to the home to support his interpretation that Olsen was required to make a home-by-home determination of whether the toddler was likely to be in that particular home, rather than merely relying on the fact that a home was one of many accessible to and within walking distance of the missing child.

The court disagrees.  *Gambino-Zavala* focused on the home because in that case, the exigency was limited to one home; a neighbor heard gunshots in a particular unit, and officers

---

[18] 539 F.3d 1221, 1225 (10th Cir. 2008) (emphasis added).

subsequently searched that unit to determine if anyone inside was injured.[19]  Nothing in *Gambino-Zavala*, or in Tenth Circuit law in general, purports to require the narrow focus Kendall proposes.  Indeed, the Tenth Circuit used to require something similar—a "reasonable basis, approaching probable cause, to associate the emergency with the place to be searched"— but in 2006 replaced it with the more general requirement that "the manner and scope of the search [must be] reasonable."[20]

This general reasonableness requirement reflects the reality that not all exigencies are neatly confined to one home.  To be sure, in the case of a neighbor reporting gunshots from a particular home, the "locations where a victim might likely be found" may well be limited to that one home.[21]  But in cases like this one, where a child has been missing for an hour, the child might likely be found anywhere within a several-block radius.  The Tenth Circuit's reasonableness requirement accommodates this reality by recognizing that when a genuine and significant exigency spans a large area, a somewhat broader geographical search may be warranted.

This simple proposition is lost in Kendall's proposed rule.  Indeed, Kendall's strict interpretation of the exigency exception—which would require officers to determine, at each home, whether there's reason to believe the child is actually there, as opposed to any other home—would all but end police assistance in missing child cases like this one, where officers know little more than where the child was last seen and how long he has been missing.  Armed only with this information, there is no reason, for example, to believe the child is any more likely

---

[19] *Id.* at 1224.
[20] *Najar*, 451 F.3d at 718.
[21] *Id.* at 720.

11

to be in an open backyard on the north side of the child's home than he is to be in an open backyard on the south side of the home.  According to Kendall, that means neither gets searched. That doesn't comport with what we expect of officers urgently looking for missing children, and is not reflected in the law.

This is not to say, as Kendall's attorney suggested at oral argument, that all Fourth Amendment rights go out the window for any home within walking distance of and accessible to the missing toddler.  Quite the contrary—even after establishing the reasonable geographic scope of a search, the Fourth Amendment still demands that the *manner* of searching any home within that area also be reasonable (meaning the intrusion is no greater than necessary).  This reflects the understanding that even among protected Fourth Amendment areas, the intrusiveness of a search can vary greatly.  A sweep of the curtilage is less intrusive than breaking down a locked door and searching a living room, which is less intrusive than rummaging through a closet in the bedroom, and so forth.  The Fourth Amendment cabins the intrusiveness of any search by demanding that the manner of the search be reasonable.

And like scope, what is reasonable in terms of manner will vary depending on the nature of the exigency.  While it is reasonable for police to forcefully enter and search a home after reports of gunfire in that home,[22] nobody contends that Olsen could have barged into and searched any home within a fixed radius of the missing toddler.  Given the nature of the exigency in this case—a missing, noncommunicative toddler—and the scope of the search—a several-block radius—it was reasonable to knock on doors and briefly sweep open backyards where a toddler may have ventured.  Olsen was not free to break into homes and ransack bedrooms.

---

[22] *See Gambino-Zavala*, 539 F.3d at 1225–26.

Indeed, contrary to Kendall's contention, the court's holding does not imply that Olsen had "virtually unbounded authority to enter into and search people's private homes . . . [across] the Wasatch Front, or perhaps beyond." Rather, the court holds only that where a nonverbal toddler has been missing from his home for over an hour, it is reasonable, within walking distance of the missing toddler, for officers to knock on doors and conduct a quick sweep of open backyards into which the toddler may have wandered.

In sum, the court concludes that even if Olsen's warrantless sweep of Kendall's backyard was a Fourth Amendment search, it was not unconstitutional because it was justified by exigent circumstances. And even in the event it was an unconstitutional search, Olsen would be entitled to qualified immunity because his mistake as to what the law requires would be reasonable. On this point Kendall has the burden of pointing to Tenth Circuit or Supreme Court case law that would put a reasonable officer on notice that when a nonverbal toddler is missing, a searching officer must have a reason, aside from mere proximity, for quickly sweeping any open and accessible nearby backyard. Kendall has provided no such authority. Thus, summary judgment on Kendall's claims related to Olsen's search is granted in Defendants' favor, both on the basis that no constitutional violation occurred and that Olsen is entitled to qualified immunity.

## III.     The Seizure

Kendall also contends that Olsen's shooting of his dog was an unconstitutional seizure under the Fourth Amendment. The Fourth Amendment prohibits unreasonable seizures.[23] And nobody disputes that Olsen's shooting of Kendall's dog was a seizure.[24] Thus, the only question

---

[23] *See* U.S. Const. amend. IV; *see also Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1188 (10th Cir. 2001).

[24] *See* Dkt. 35 at 34; *see also Dziekan v. Gaynor*, 376 F. Supp. 2d 267, 270 (D. Conn. 2005)

is whether the shooting was reasonable in view of the facts presented.  In this context, reasonableness turns on weighing the intrusiveness of the seizure against the government's reason for doing it.[25]  Put simply, the less intrusive the seizure and the more compelling the government's justification for it, the more likely it is to be constitutional.

The intrusion here was quite serious.  While Fourth Amendment seizures generally involve property, this case involved a dog, and courts have recognized that most dog owners "think of dogs solely in terms of an emotional relationship, rather than a property relationship."[26] Thus, when a dog is seized—and especially, as here, where it is killed, not merely injured or detained—the intrusion on the owner weighs heavily in favor of finding the seizure unreasonable and unconstitutional.

On the other side of the equation is officer safety, also a weighty concern.  Officers face a changing array of threats daily.  Among these threats are dogs, some of which "may harass or attack people," and "maim or even kill."[27]  Thus, while many dogs pose no serious threat to officers, some do, and because officers are often forced to make split-second judgments about the threat a particular dog poses, their ability to effectively protect themselves also weighs heavily in the legal reasonableness calculus.

Courts have found a balance between the rights of dog owners and the interests of officer safety by implementing a simple rule: an officer's killing of a dog is reasonable only if the dog

---

("Courts have consistently recognized that a law enforcement officer's killing of a pet dog constitutes a destruction of property and therefore a seizure under the Fourth Amendment.").

[25] *Graham v. Connor*, 490 U.S. 386, 396 (1989).

[26] *Altman v. City of High Point, N.C.*, 330 F.3d 194, 205 (4th Cir. 2003).

[27] *Id.*

poses an "imminent threat."[28]  Whether a dog poses an imminent threat is judged "from the perspective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight."[29] In other words, the question is not whether the dog, in retrospect, actually posed an imminent threat, but instead whether a reasonable officer on the scene would perceive it that way.

In this case, the uncontradicted evidence demonstrates that a reasonable officer in Olsen's position would conclude that Kendall's dog posed an imminent threat when it aggressively charged Olsen while simultaneously barking loudly and baring its teeth.  That evidence consists entirely of Olsen's testimony about the event, because he was the only one to witness it.  In his police report, written hours after the incident, Olsen reported that he "saw a large gray dog running towards [him] and barking loudly," and that he "believed the dog was about to bite [him]."[30]  In his deposition, he testified that "the dog had a very mean demeanor," its "ears were back, the tail[] w[as] straight, the teeth were bared, it was snarling, barking loudly and actually running towards [him]."[31]  Olsen testified that in the moment before he pulled the trigger the dog "was leaping towards [him]."[32]  Given this testimony, a reasonable officer could conclude that the 90-pound Weimaraner posed an imminent threat.

---

[28] *See Branson v. Price*, No. 13-cv-03090-REB, 2015 WL 5562174, at *6–7 (D. Colo. Sept. 21, 2015) (listing cases).  It does not appear that the Tenth Circuit or the Supreme Court has weighed in on the proper standard in this circumstance, but as *Branson* demonstrates, the clear consensus among courts of appeal is that an officer may reasonably kill a dog that presents an imminent threat.  *Id.* (examining cases from the Third, Seventh, Eighth, and Ninth Circuits, and finding no circuit decision to the contrary).
[29] *Graham*, 490 U.S. at 396.
[30] Dkt. 46, Ex. (A)(2)(1).
[31] Dkt. 63, Ex. (A)(2) at 93.
[32] *Id.* at 97.

15

Kendall takes issue with this conclusion for several reasons.  First, he contends that various inconsistencies in Olsen's testimony render him not credible and his testimony not believable.  These inconsistencies include: (1) Olsen testified he may have heard his partner ring Kendall's doorbell, while his partner testified that he knocked on the door; (2) Olsen testified he heard a doorbell and knocking from his location at Gate B, but Kendall submits that was too far from the front door to hear knocking or a doorbell; (3) Olsen testified he waited to enter the backyard until it appeared that nobody would answer the door, but his partner testified that he heard gunshots shortly after he started knocking; and (4) Olsen at times reported that it took about thirty seconds to check the backyard and at other times testified it took about a minute and a half.  The court finds that these are relatively minor inconsistencies that might be expected of a person trying to describe a dynamic and quickly evolving situation.  They are not material inconsistencies sufficient to give rise to an inference that Olsen is deliberately lying or that his recollection of key events is suspect.  Because no reasonable jury could find Olsen not credible based on his statements in the record before the court, Kendall has failed to raise a triable issue of fact to defeat summary judgment.

Kendall also argues that even taking Olsen's testimony at face value, a reasonable officer could not conclude based on those facts that he faced an imminent threat.  Kendall first contends that "Olsen had no lawful reason to be in [the] yard in the first place."[33]  That argument addresses whether the *search* was reasonable, and the court already concluded that it was.  He next argues that Olsen invited the attack because he "recklessly started running as soon as he

---

[33] Dkt. 45 at 83.

heard [the] bark, which anyone should know would simply provoke a dog to run after him."[34] An officer's split-second decision to make a break for the gate to escape or avoid a confrontation, rather than standing his ground to face a charging 90-pound dog, is not unreasonable.  Moreover, Olsen did ultimately try the tactic Kendall now suggests he should have taken: Olsen testified he first attempted to retreat, but then, realizing the dog would beat him to the fence, turned and "tried standing [his] ground and taking a more dominant stance, broadening [his] shoulders and stomping [his] foot, in an attempt to 'call [the dog's] bluff,'"[35] but to no avail.

Kendall also argues that Olsen should have known that Weimaraners are typically "friendly, warm, kind dogs who do not bite without being cornered."[36]  While this may well be so, it tells the court nothing about how this Weimaraner acted on this specific occasion.  Just as breeds with reputations for being dangerous or aggressive may act in friendly or docile ways in many circumstances, so too can dogs typically thought to be warm and docile act aggressively at times.  Regardless, officers are not charged with developing specific expertise in the nuances between breeds.  To be sure, had Olsen been greeted with a 5-pound Pomeranian the analysis would be different, but he was confronted with a large, 90-pound dog, and it was reasonable to assume the charging dog posed a threat.  In the same vein, Kendall argues that this particular dog was friendly and nonaggressive, as demonstrated by testimony of Kendall's sister and neighbor. This testimony may be relevant to whether Kendall's dog in fact posed a threat to Olsen, but that's not the question the court must answer; the question presented for Fourth Amendment

---

[34] *Id.* at 84.
[35] Dkt. 36 at 4.
[36] Dkt. 45 at 85.

17

purposes is whether a reasonable officer on the scene would believe the dog posed an imminent threat. A reasonable responding officer would not be expected to know anything about Kendall's dog's history, and would instead be expected to act reasonably based on the facts in front of him. Those facts—which, again, are not in dispute—are that a 90-pound dog charged Olsen while barking aggressively.[37]

Last, Kendall argues that Olsen acted unreasonably because he did not first try to use lesser force, like his baton, his boot, or his taser. But the law does not require officers to try varying degrees of nonlethal force before turning to lethal force. Indeed, "an officer need not use the least harmful alternative in dealing with a dangerous situation in which officer safety is an issue."[38] This is so even where, in retrospect, a lower degree of force may have been sufficient. The standard is not what a lawyer, or a judge, or anybody scrutinizing the situation with the benefit of retrospective deliberation would have done. The standard is what a reasonable officer on the ground in the moment would have done, an officer who is "forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[39] In this case, a reasonable officer could conclude that lethal force was required.

---

[37] *See, e.g.*, *Williams v. Voss*, No. CIV. 10-2092 ADM/TNL, 2011 WL 4340851, at *4 (D. Minn. Sept. 15, 2011) (no genuine issue of fact about whether dog was aggressive where officer's "sworn affidavits stat[ed] that the dog charged at them aggressively" and plaintiff had "no specific evidence to refute that assertion" because other witnesses "could not see the dog at the time it was shot").

[38] *McCarthy v. Kootenai Cty.*, No. CV08-294-N-EJL, 2009 WL 3823106, at *6 (D. Idaho Nov. 12, 2009).

[39] *Graham*, 490 U.S. at 396–97.

18

When presented with what appears to be an imminent threat, an officer need not wait to be mauled or attacked before employing force in self-defense.  Kendall has not demonstrated that Olsen's actions deviated from a what a reasonable officer would have done.  And even if Olsen's actions were unreasonable—that is, even if the shooting was an unconstitutional seizure—Olsen would be entitled to qualified immunity because a reasonable officer would not be on notice that shooting a 90-pound dog that is running toward him and barking, with no time for the officer to escape, would violate the Fourth Amendment.  Defendants' Motion for Summary Judgment on the Fourth Amendment claim against Olsen is granted.

### IV.    The Claims Against the City and Lieutenant Purvis

In addition to his claim against Olsen, Kendall brought a claim against the City alleging, in essence, that if Olsen violated the Constitution, so too did the City because it had policies or practices in place that permitted or encouraged Olsen to act unconstitutionally.  Because the court has now determined that Olsen did not violate the Constitution, neither did the City. Similarly, Kendall brought a claim against Lieutenant Purvis (the officer who ordered Olsen to canvass the neighborhood) alleging that Purvis has liability for any constitutional violation Olsen committed while conducting the canvass because Purvis ordered Olsen to do it.  Again, because the court determined Olsen committed no constitutional violation, neither did Purvis.  The court grants Defendants' Motion for Summary Judgment on the federal constitutional claims against the City and Purvis.

### V.    The State Law Claims

Having dismissed all of Kendall's federal claims, the court must now decide what to do with his remaining state law claims.  This is a court of limited jurisdiction, meaning it is

authorized to hear only certain types of claims.[40]  Generally, state law claims are not among those the court can decide, unless certain conditions are met.  The condition that allowed the state claims to initially go forward in this case was that they were related to the federal constitutional claims, over which this court does have jurisdiction.[41]  As discussed above, those claims are now dismissed.  The court in some instances may continue to hear associated state claims, notwithstanding dismissal of the federal claims, but this is disfavored.[42]  Indeed, the Tenth Circuit has made clear that after dismissing federal claims, "the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."[43]  Given this guidance from the Tenth Circuit, and given Utah's interest in the remaining legal issues arising under state law, the court declines to exercise supplemental jurisdiction over Kendall's remaining state claims.  Those claims are remanded back to state court.

## CONCLUSION

This case is tragic on several levels.  Parents feared their child missing, officers urgently responded, and Kendall lost his beloved companion animal.  The court is mindful of the strong reactions this case has aroused among animal owners, parents, law enforcement, and community members.  The case has exposed tensions that can arise between important competing interests, and the court has done its best to resolve these tensions while constraining its analysis to the facts presented by the parties and the established law.

---

[40] *See Gad v. Kan. State Univ.*, 787 F.3d 1032, 1035 (10th Cir. 2015).
[41] *See* 28 U.S.C. § 1367.
[42] *See Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011).
[43] *Id.* (quoting *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998)).

For the reasons stated above, the court concludes that Kendall has failed to establish either an unconstitutional search or seizure under the Fourth Amendment.  But even if Officer Olsen's search or the shooting of Kendall's companion pet amounted to a violation of a constitutional protection, Kendall has failed on the record before the court to establish that the law concerning officer conduct at the time was clearly established—providing fair notice to reasonable officers under similar circumstances that Officer Olsen's conduct was unconstitutional.  The court awards summary judgment to Olsen, Purvis, and the City on Kendall's federal constitutional claims.  The case is remanded back to state court to resolve Kendall's state law claims.

DATED this 17th day of February, 2017.

BY THE COURT

_____
Honorable Robert J. Shelby